363 So.2d 1152 (1978)
ATLANTIC NATIONAL BANK OF JACKSONVILLE, a National Banking Association, Appellant,
v.
MODULAR AGE, INC., Brown Transport Corporation, C.P. Brown and I.C. Hemmings, Appellees.
No. HH-420.
District Court of Appeal of Florida, First District.
November 6, 1978.
Gary B. Tullis of Ulmer, Muchison, Ashby & Ball, Jacksonville, for appellant.
Robert L. Cowles of Cowles, Coker & Myers, and Edward A. White, and E. Earle Zehmer, of Bedell, Bedell, Dittmar & Zehmer, and Delbridge L. Gibbs, of Marks, Gray, Conroy & Gibbs, Jacksonville, for appellees.
McCORD, Chief Judge.
This is an interlocutory appeal from an order of the circuit court granting partial summary judgment in favor of defendants-appellees on plaintiff-appellant's suit seeking damages under a performance bond for alleged breach of a construction contract by the general contractor (appellee Modular Age, Inc.). We affirm.
The record on summary judgment shows that Ellinor Motor Company, the owner of certain real property in Seminole County, entered into a standard form AIA contract with appellee general contractor Modular Age for the construction of a lodging facility consisting of 102 modular units. Appellant Bank was the construction lender and executed a building loan agreement (mortgage) which identified Ellinor Motor Company as the owner and specifies that Henry H. Jordan, AIA, is the "owner's architect." It further provided by way of a written addendum signed by Henry H. Jordan that he agreed to act as the Bank's architect in *1153 the event of default by the owner. The Bank required the general contractor, Modular Age, to post the performance bond upon which this suit was based. The bond was prepared by the Bank's attorneys and signed by appellees Brown Transport Corporation, C.P. Brown and I.C. Hemmings as nonprofessional and gratuitous sureties. As part of the transaction, the sureties obtained from Frederick B. Ellinor (the principal stockholder of the owner) a hold harmless agreement.
The motel was completed and on August 7, 1973, was licensed to operate by the Florida Hotel and Restaurant Commission and opened for business just prior to the "Arab oil boycott" in the following October and the tourist trade slump resulting therefrom. The motel lost money from the beginning of its operation. Ellinor Motor Company advised appellant of its financial distress in October but kept the motel in operation during 1974 and until September 3, 1975, when it closed.
In November, 1973, appellant decided to employ architects and engineers to inspect the motel. At that time it contemplated a suit against the sureties to compensate it for its loan. The architects and engineers employed by the Bank, Reynolds, Smith & Hill, made several inspections of the motel and concluded that the wall construction between the tenancies did not meet the requirements of the Southern Standard Building Code in that they would not provide one hour fire resistance between tenancies. Rather than foreclose its mortgage, the Bank, on June 19, 1974, filed this action alleging that the motel was valueless and seeking the full amount of the contract performance bond in damages. In July of 1975, appellant again utilized Reynolds, Smith & Hill to remove a wall section from a motel module and take it to a laboratory in Miami retained by appellant where heat and flames from four gas jets were applied directly to the wall sections without the fire protection benefit of the fire sprinkler system which was installed in the motel. On the basis of that test, the laboratory prepared a report finding the walls to be unsatisfactory and below minimum fire resistance requirements.
The contention of appellant in this suit is that these walls did not meet the Southern Standard Building Code for fire resistance; that it was the contractor's responsibility to provide walls which would meet the code requirements and by failing to do so, the contractor breached its contract with Ellinor; that therefore appellee sureties are liable to appellant under the performance bond for the amount of its loan. Appellee sureties contend that the contract was not breached by the contractor; that the walls did meet the code requirements but that even if they did not, such was the fault of the owner's architect Henry Jordan pursuant to the contract entered into between the owner and the contractor and the construction loan agreement and it involved no breach of contract by the building contractor.
We do not find the question of whether or not the walls met the requirements of the code to be the controlling issue on this appeal. The basic question is whether or not walls which would meet the code were a design requirement for which the architect was responsible or a construction requirement, independent of design, for which the building contractor was responsible.
Frederick Ellinor, the owner of Ellinor Motor Company, first became interested in construction of the motel in December, 1971. He talked with Mr. McKnight of Modular Age, the eventual contractor, at a meeting in Atlanta on January 4, 1972. From that discussion, Ellinor was committed to utilizing modular unit construction. Such construction involves the use of room modules manufactured at a point distant from the job site, finished as to the interior but unfinished as to exterior walls, ceilings and floors. These modules are then delivered to the construction site where they are incorporated into the building in such a manner as to form a completed motel. At that first meeting, Ellinor met Henry Jordan who was later named as architect of the project. The construction contract between Ellinor Motor Company and Modular *1154 Age was executed on July 18, 1972. Later that month, Mr. Ellinor was advised that Peachtree Industries, the producer of motel modules initially considered by the parties, had raised its unit price by $550, which put the cost beyond the terms of the contract. Mr. McKnight, of Modular Age, then suggested using modules incorporating a new design of wall panel manufactured by Brown Watkins Company. This proposed construction utilized modular units constructed with machine-produced wall panels consisting of aluminum studs and polyurethane foam encapsulated between plywood paneling and heavy Kraft material.
By letter of September 5, 1972, the project architect, Henry Jordan, certified to the building official of Sanford, Florida, that:
"The plans submitted on the Cavalier Motor Hotel, Sanford, Florida, conform to the laws as to Egress [sic], type of construction and general arrangement, and conforms to the requirements of the Southern Standard Building Code." (emphasis supplied)
A building permit was issued the following day by the City of Sanford. A building permit had previously been issued on August 22, 1972, by the supervising architect of the Florida Hotel and Restaurant Commission. Chamberlain Manufacturing Corporation having acquired the wall panel process and machine from Brown Watkins, entered into a subcontract with Modular Age on September 27, 1972, to produce room modules for the motel. This subcontract does not specifically require Chamberlain's product to meet all requirements of the Southern Standard Building Code but by letter of November 28, 1972, Henry Jordan, project architect, appointed Robert A. Wanninger, Architect, to make in-plant inspections of the completed modular motel units at Chamberlain's facility in Monroe, Georgia. Part of Wanninger's responsibility was to verify code compliance of the modules prior to delivery of the units to the job site. Jordan's letter states:
"We hereby approve your appointment as inplant inspector for the Chamberlain Manufacturing Co., Monroe, Georgia, manufacturer for the motel room modules for the Cavalier Motel Hotel, Sanford, Florida.
"Your firm will be responsible for certifying that these modules meet or exceed all requirements of the Southern Standard Building Code."
Each of the 102 modular units utilized in the construction of the motel was individually inspected by Mr. Wanninger's firm and approved in a series of certificates which recited:
"The following motel modules were inspected by my firm and were found to be built in accordance with provisions of the Southern Standard Building Code."
The originals of these inspection reports were sent to the owner's architect, Henry Jordan, and copies were distributed to the owner, the building official in Sanford, and to the contractor. The last modular units used in this project were inspected and approved by Wanninger's firm as of February 21, 1973, and delivered to the job site and ultimately used in the motel.
By letter of September 5, 1972, to the Sanford building official, Jordan had designated Lee Sayers, a Florida architect, to make on-site inspection of the work both on the status of the project and for its compliance with all applicable codes. The certificates of Mr. Sayers were provided to appellant pursuant to the terms of the building loan agreement by which they were required as a condition to the bank disbursements. The building loan agreement, among other things, required that the architect certify "that all work and materials are in accordance with the Plans; that all certifications and approvals which may be necessary or customary at such state of construction have been received; that all work has been done in a good and workmanlike manner." Pursuant to the building loan agreement, Sayers inspected and approved all the modules except for minor items not material to this appeal and none of the modules were disapproved or rejected by Sayers for the deficiency in the walls which the Bank here asserts. In addition, the undisputed *1155 testimony of Mr. Braceland, the present building official of the City of Sanford, was that the Sanford Building Department made periodic inspections during the construction of the project and made its three final inspections in the summer of 1973 approving all of the construction. Certificates of occupancy were then issued by the City of Sanford certifying that the motel complied with the building code enforced in the City of Sanford.
After argument of counsel on the motion for summary judgment, the trial judge advised all counsel by letter of September 16, 1977, as follows:
"In addition to the argument heard on the various motions for summary judgment, I have examined all the applicable pleadings, depositions and affidavits and have concluded that the architect Jordan was the architect for the owners of the motel; that the motel was constructed to the plans and specifications under the supervision of the architect and his appointed supervising architects; that the architect approved and certified that the motel was constructed according to these plans and specifications and that at the time of its construction and delivery over to the owners it complied with the provisions of the Southern Building Code. The bank stands in the shoes of the owners and is bound by the approval of the architect. I find no genuine issue of material fact on all of this and, therefore, the defendants are entitled to a summary judgment as a matter of law."
Appellant contends that the motel room modules were components of material for which the contractor was responsible rather than elements of project design for which the architect was responsible and that there is a material issue of fact on this question and a further material issue of fact as to whether or not architect Wanninger was the designated representative of architect Jordan. We disagree. The contract provides as follows:
"4.7.1 The Contractor shall secure and pay for all permits, governmental fees and licenses necessary for the proper execution and completion of the Work, which are applicable at the time the bids are received. It is not the responsibility of the Contractor to make certain that the Drawings and Specifications are in accordance with applicable laws, statutes, building codes and regulations." (Emphasis supplied.)
It is clearly an architect's function and responsibility to design walls which will meet code requirements for one hour fire resistance rating between tenancies. It is his responsibility to insure that the plans and specifications comply with the applicable building codes for the area where the structure is to be built. See Bebb v. Jordan, 111 Wash. 483, 189 P. 553 (1920). There is no question but that Henry Jordan, the architect for the owner as well as for appellant, assumed that responsibility. Though he did not personally design the walls in question, he delegated that responsibility to others. This duty of the architect cannot be avoided by delegating the responsibility of insuring that portions of this design comport with the applicable laws and regulations. Johnson v. Salem Title Company, 246 Or. 409, 425 P.2d 519 (1967). An argument similar to the argument of appellant here was rejected by the Supreme Court of Washington in Teufel v. Wienir, 411 P.2d 151 (Wash. 1966). There, as here, the construction contract incorporated "these Standard General Conditions for the Construction of Building of the American Institute of Architects." The question there involved the issue of whether the prime contractor could be held accountable to the owner for damages resulting from an insufficient wall installed on a high rise building. The owners sought to hold the contractor liable for the insufficiency based on the argument that the faulty walls were faulty materials for which the contractor was responsible. The court rejected that argument stating that the alleged problem was not the result of an isolated failure in one or a few of the wall systems or material, but rather was an indictment of the wall system's sufficiency as a whole, and that this was a design function for which the owner's architect was responsible. There the owner argued *1156 as appellant argues here that the AIA warranty or guaranty provision that the contractor will replace or repair defective materials within one year obligated the contractor to make good the defective walls. The court in ruling against this contention stated:
"... If an item is installed in accordance with the specifications of a standard American Institute of Architects guaranty, the contractor is not liable if the item's failure to function properly is due to its design being improper for the intended use."
We further find no merit in appellant's contention that there is an issue of material fact on the question of whether or not Robert Wanninger was the designated representative of Jordan. The above-quoted letter of November 28, 1972, of Jordan to Wanninger obviously makes Wanninger his agent. The architect is defined in § 2.2.1 of the general conditions of the construction contract to mean "the Architect or his authorized representative." Based upon deposition testimony suggesting that Wanninger was employed and paid by Chamberlain, appellant argues that there is a disputed issue of fact as to whether Wanninger was the designated representative of Jordan. In addition to the above-mentioned letter of Jordan to Wanninger, Wanninger's affidavit stands undisputed that he was appointed by Jordan to perform the in-plant inspections. Thus, regardless of his source of compensation, he was so appointed and accepted the appointment.
We have considered the remaining issues raised by appellant and found them to be without merit.
AFFIRMED.
BOYER, J., and McLANE, RALPH M., Associate Judge, concur.